IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 23, 2014 Session

## CATHY TURNBO FRANKS v. RONALD FRANKS

**Appeal from the General Sessions Court for Hardin County**
**No. 7706     James Y. Ross, Judge**

_____

**No. W2014-00429-COA-R3-CV - Filed January 2, 2015**

_____

This appeal involves various financial issues relative to a divorce. Husband appeals the trial court's determination of several factual findings relative to alimony, including Wife's ability to secure employment, Husband's ability to earn in the future, the award of attorney's fees to Wife, and the value of several marital assets divided in the property division, including the value of an LLC jointly owned by the parties. Wife also appeals the trial court's determination of value and the division of the parties' joint interest in the LLC, which the trial court awarded to Husband without assigning a value. We vacate the judgment of the trial court and remand for appropriate findings of fact and conclusions of law.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Vacated and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

J. Gilbert Parrish, Jr., Savannah, Tennessee, for the appellant, Ronald Franks.

Chadwick Hunt, Savannah, Tennessee, for the appellee, Cathy Turnbo Franks.

### MEMORANDUM OPINION[1]

_____
[1]Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

(continued....)

BACKGROUND

Ronald Franks ("Husband") married Cathy Turnbo Franks ("Wife") on April 11, 1986. The Franks were married for twenty-seven years. They separated in February 2011, and Wife filed her complaint for divorce on September 26, 2011. The Franks had two children who reached majority by the time of the divorce trial. The parties jointly owned a one-half interest in Ronald Franks Construction, LLC ("the LLC"), a construction business. During the marriage, the parties acquired considerable property, including a marital home, a river lot home, and several pieces of unimproved real property. The parties also acquired stock and investment accounts, a luxury motor home, and other personal property. On October 19, 2011, Husband filed an Answer and Counter Complaint to the Complaint for Divorce.

On September 9, 2013, the trial court entered an Agreed Order and Approval of Stipulations. The order stated that the parties had agreed to settle the issue of the ground for divorce before trial, and that the ground for divorce was separation for two or more years pursuant to Tennessee Code Annotated Section 36-4-101(a)(15).[2]

The divorce trial occurred on December 5, 2013. As a preliminary issue, at trial, counsel for both parties stated that they had stipulated to the admissibility of two binders of documents without objection to the custodian of the records not being present. The binders included 842 pages of the parties' financial documents, including "tax returns, financial information, bank statements and other matters." The parties also stipulated that "fault of either party will not be considered by the Court for any purpose, including for purposes of spousal support, or obviously grounds for divorce."

At trial, both parties and the LLC's bookkeeper testified. Wife testified that she was fifty years old. She explained that she had been working at a restaurant for around a year and a half during the divorce proceedings. At the restaurant, she "either work[s] on the buffet,

---

(....continued)
This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION", shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

[2]Tennessee Code Annotated Section 36-4-129 permits "[i]n all actions for divorce from the bonds of matrimony or legal separation the parties may stipulate as to the grounds and/or defenses."

or I might waitress one night a week. And I run the cashier, too." Although her salary varied weekly, she testified that she usually made around $160.00 per week. Some weeks she said she made significantly less. She also received $1,200.00 per month in child support from Husband even though the younger of the parties' children, the minor child she had been receiving support for, had reached the age of majority. All together, she testified, her income was around $2,000 per month.

Regarding the LLC, Wife testified that she believed she was a "member or a partner" of the LLC. She stated that she was involved in its operations as a bookkeeper when the LLC first began. She testified that later on the LLC outgrew her bookkeeping abilities, stating that "[the LLC] grew so fast that it just got where I couldn't do it any more." Although she did not keep the books any more for the LLC, she stated that she still "helped do stuff in the office, and cleaned the office, and done a lot of things."

Wife also testified about her educational and vocational background. Although she graduated high school, she had no college education. She testified that she had taken some courses to become certified as a court reporter, but did not finish the course work. She also stated she "[didn't] know of any reason" preventing her from returning to finish her training to become a court reporter. However, Wife also stated that it was unlikely at this point in her life for her to go back to school. She testified that she intended to remain in the restaurant business, but that she would never be able to "rise to level of income that [Husband's] capable of making." On cross-examination, Wife admitted to additional work experience during the marriage, including work at a sewing machine factory, as well as assembly line work at Tennessee River Manufacturing and Johnson Controls.

According to Wife's testimony, the parties had two children together. Wife testified that the parties made a mutual decision for her to stay home and raise the children. Although both children had reached the age of majority at the time of trial, the parties' daughter still resided with Wife. Wife stated that the parties' son lived in their river lot home, while Husband lived "down below it." Despite claiming that there was a large discrepancy in her and Husband's incomes, she answered she "ha[d] no idea" as to what Husband's income was. In response to a question regarding the LLC's obligations and whether Husband was personally liable for them, Wife stated, "I'm sure he [is]."

Wife further testified that she still resided in the parties' marital home, and that Husband continued paying the mortgage as Wife could not afford to make the payment on the home. She valued the home at $430,000.00, but affirmed that there was approximately $250,000.00 in debt on the home. When asked whether it would be "much more practical and reasonable to keep and maintain" the river lot home than the marital home, Wife stated, "In the yard, yes." She testified that the river lot home was different than the marital home

in several respects, including lacking a swimming pool, lacking a garage, and having considerably less square footage. According to Wife, however, the river lot home was newer. Still, she said the reason she did not want to live there, rather than Husband, was because "That's not my home."

Wife also testified about the money she would need in order to continue to live in a manner relatively similar to what she had in the past. When asked about the specific amount of alimony she needed, she stated she thought "$5,000 a month is fair." She testified that she would use part of that money to pay for a car, a place to live, and health insurance for herself. Regarding her attorney fees, Wife stated that she was only able to afford an attorney because of her father's assistance.

Husband testified that he was also fifty years old at the time of trial, and that he worked for his own construction business, the LLC, which he began in April 1996. When asked about the LLC's financial status, Husband replied, "It's not good." He explained that the LLC had previously found niche work with pipeline companies and within the fiber optic market, but "there's not really been another great nitch [sic] since then. Now we do a lot of sewer, water, municipal type work. We do a lot of - - some construction management. We've done quite a bit of that on some schools. That's not been good at all." In his testimony, he reasoned that the decline was due to the economic downturn. Husband testified that the LLC was able to remain in business throughout the last five years because it worked off credit lines and borrowed money. According to Husband, the LLC had to sell some mortgaged pieces of equipment and liquidate $658,506.81 in certificates of deposit, all of which Husband says were used to satisfy the LLC's debts. Further, Husband stated he is personally responsible for a $436,138.33 loss in equity as stated on the LLC's balance sheet.

Husband also testified that the LLC used accrual accounting[3] for certain years,[4] and thus, the recorded profit of $724,306.00 for the year 2011 had not actually been fully collected by the LLC. The next year, in 2012, according to Husband, the recorded profit was $830,000.00, but that amount had not been fully collected by the LLC. Husband also testified that a few years earlier, in 2010, the LLC suffered a loss of $1,617,000.00, but on a cash

---

[3]The "accrual accounting method" is an "accounting method that records entries of debits and credits when the revenue or liability arises, rather than when the income is received or an expense is paid." *Black's Law Dictionary* 22 (9th ed. 2009).

[4]According to Husband, "[A]fter you go over a certain amount of dollars in revenue, the system automatically makes you revert over to an accrual basis of accounting. And I thinking [sic] it's somewhere - - if you add the sum of three years and you go over a 20 or a 24 million dollar gross revenue, it puts you on an accrual basis of accounting."

accounting basis.[5] This loss was reflected on the LLC's tax return for that year. Several of these losses occurred when, according to Husband, money was stolen during the jobs he had in Louisiana, which Husband referred to as "a den of thieves."

Due to the LLC's downturn, Husband stated that his standard of living has "definitely" changed. He revealed that he had been living in the parties' motor home that was parked on the river lot property. He testified that, at the time of trial, he did not have the ability to repay all the debt he owed, and that he would have to liquidate some assets in order to pay it. According to Husband, his monthly income was "somewhere around $7,200.00 a month," or $1,800 per week, paid by check from Ronald Franks Construction. However, he also testified that he "[wouldn't] be surprised" if his bank records reflected more had been deposited into his account than that. Husband explained that "[t]here are months that I get paid more." Some of the payments from the LLC reflected in his bank account, according to Husband, constitute reimbursement for when he turns in his cash receipts. He stated he would be unable to afford Wife's request of $5,000.00 per month alimony.

From December 9, 2011 through June 9, 2013, Husband charged $79,645.94 on his business credit card, amounting to, on average, $4,191.89 per month. He testified that around half of these charges, approximately $2,095.94 per month, were personal charges. According to Husband, these personal charges were in lieu of a *per diem* that a company would typically extend to its employee during out-of-town work. His credit card expenses, he stated, were for everyday items, including groceries, and business expenses, including a "motel, an RV spot, my food." Sometimes, Husband stated, on out-of-town jobs, Husband would charge food to the credit card to feed his employees. Husband testified that, "I do not draw a per diem. I get - - everything that I do gets paid." Husband provided that his business credit card is the only card in his possession. The LLC's bookkeeper, Ms. Willoughby, testified that she paid all of the monthly balances on the business credit cards. There is no evidence that Husband reimburses the LLC for any charges made on his business credit card, including those classified as "personal," as, according to Husband, they are in lieu of a *per diem*.

Regarding other expenses, like restaurant bills and golf tabs, Husband stated:

> I can definitely explain to the Court what that's about. I have clients that come in and out, and that I try to get in with. Well, one of the ways that you do that is you buy their supper, and you

_____

[5]A "cash-basis accounting method" is defined as an "accounting method that considers only cash actually received as income and cash actually paid out as an expense." *Black's Law Dictionary* 22 (9th ed. 2009). During the hearing, the trial court stated regarding the $1,617,000.00 loss, "On a cash basis or accrual basis? That says cash, but I find it highly unlikely on a cash basis."

buy their lunch, and you buy them a round of golf somewhere. I have no marketing people whatsoever. Every bit of marketing that happens at Ronald Franks Construction comes from Ronald Franks going out and beating bushes and meeting people. And that's what you have to do. You know what salesmen do.

Husband also testified that some of the money is spent on his marketing tactics through his attendance at car races and buying gifts for potential clients. Further, Husband stated that he had to have "continuing education" in at least three states to maintain his license in those states. According to Husband, the company "absolutely pays for it." Husband stated that he has "gone on cruises to obtain that continuing education." During cross-examination, Husband admitted that he had gone on a particular cruise "for pleasure," but the man who invited him on this particular cruise reimbursed him via check payable to Ronald Franks Construction.

The last witness to testify at trial was Brenda Willoughby. Ms. Willoughby is an employee of the LLC. Her job responsibilities include handling the LLC's checking accounts, other banking accounts, and some of the credit card bills. She also pays Husband's personal bills. She testified that she pays Husband a salary of $1,800.00 per week. Ms. Willoughby also explained that the purported profit for year 2011 in the amount of $724,000.00 was an accrual, not cash. Like Husband, she also testified that the cruise Husband took for pleasure was fully reimbursed by the man Husband went on the cruise with in the amount of $3,700.00. Finally, Ms. Willoughby testified regarding the LLC's revolving credit lines.

Following Ms. Willoughby's testimony, the trial court took a short recess before ruling. The trial court's oral ruling was later incorporated by reference into its written order. The trial court found that the parties had the same formal education, but "based on the proof[,] the wife has no special skills and very few transportable job skills that she could use in the workforce at her age to earn anything more than - - or much more than what she's earning right now." The trial court explained that most of Wife's work experience "was at factories doing a type of production work," and "that doesn't exist in this part of the country any more. And none of those skills would allow her [to] transfer over to other jobs that may be available in the United States economy, but certainly not the Tennessee economy workforce." On the contrary, the trial court stated that "[Husband], with a general contractor's license, has special skills that would allow him to continue his course of employment indefinitely in today's economy. Certainly I don't believe that the economy is as good now as it was in 2008 and before, but based on Mr. Frank's testimony they have a lot of work and are making a lot of money." The trial court also mentioned that Wife's contributions to the marriage allowed the business to grow.

The trial court also found that, "Dividing the assets in this marriage is a little bit difficult because it appears to the Court from reviewing the exhibits, and listening to the proof, there has been some commingling between the business . . . and the individual assets of the parties." Ultimately, the trial court ordered the marital home where Wife was residing to be sold within nine months of entry of the final decree. Also, the court stated that Wife "ought to clear equal to what [Husband] paid for the river cabin at approximately $215,000.00." Wife was awarded the furnishings from the marital home, and Husband was awarded the furnishings from the river lot home. Husband also received the parties' motor home and its associated debt. The court then divided up the items of personal property.

The court noted that Wife did not put on any proof to contradict Husband's evidence of the value of the LLC at negative $218,000. Regarding the LLC, the court stated that it did "not believe that the business has a $218,069.16 negative net worth." The court also found that, "I think that business is making a lot of money, a lot more than what - - what was testified to here today, and the lifestyle of the parties, at least in the continued purchases of [Husband] during the pendency of the divorce indicates to me that, you know, he has a great credit score." To this end, the court stated that since it "can't rely on any testimony as to what the business would be worth," it would award the business to Husband without dividing its equity.

Relying on proof related to Husband's income, the trial court calculated Husband's income at $16,000.00 per month. It found that there were at least $10,000.00 in payments made each month to his account, and he was getting the benefit of $4,500.00 per month of credit card charges, without taking into account whether the charges were personal or for the LLC. Since that would be approximately $6,000 per month if he was paying taxes on the $4,500.00 amount, the court approximated his income at $16,000.00 per month.

From Husband's income, the trial court found that Wife's "request of $5,000 a month [for alimony] is very reasonable, probably less than what I would have awarded based on the math." This was designated as alimony *in futuro*.

The trial court also found that the parties' valuation of the 2008 Monaco Dynasty Yorkshire, the parties' motorhome, was not a "fair representation of the value." The trial court explained

> I saw a picture of it in there. I think that that is undervalued, and
> if it's done as that item then I don't think that as to some of the
> items that are shown in the - - or some of the valuations of this
> property that's used in the income tax return would be devalued,
> as well. And, of course, if it's not devalued they're going to get

the benefit of the depreciation, so it's a win, win for the - - for the business,[6] and a lose, lose for [Wife].

The trial court entered the Final Decree of Divorce on February 21, 2014. The order provides that Husband is ordered to pay Wife $5,000.00 per month alimony *in futuro* "finding that [Husband] has the ability to pay alimony in futuro and [Wife] has the need for support in light of the differences between her income and [Husband's]." The trial court reserved ruling on the amount of attorney's fees, but ordered Husband to pay the cost of the cause once Wife's counsel submitted an affidavit in support of his fees. Wife's counsel filed his affidavit on March 3, 2014, and the trial court entered an order on the same day approving the $15,000.00 in attorney's fees.[7]

## ISSUES

Husband presents three issues on appeal, which we restate slightly:

I. Whether the trial court erred in establishing alimony upon factual findings which were, as Husband claims, unsupported by the preponderance of the evidence presented at trial.

II. Whether the trial court erred in concluding that Wife had a need to receive $5,000.00 of alimony per month.

III. Whether the trial court erred in awarding Wife her attorney fees in connection with the divorce trial.

---

[6]It is not apparent from the record whether the business had any interest in the motor home. However, Wife did testify that when they would take the motor home and "get ready to go off on a trip," including paying to fill the motor home with gas, it was "[c]harged to the company." Husband, too, testified that during out-of-town business trips he would "want to go to Sam's [Club] and buy food and cook it on the motor home."

[7]Although several motions were pending at the time the final decree was entered, the relief requested in these motions was addressed in the final decree and, therefore, subsumed by the final decree. Within the final order entered in the case, which addressed the issue of attorney's fees, we note that the trial court purported to certify the order as a "final order to the purpose of appeal under Rule 54 TRCP." Even though we conclude that the trial court's judgment was final, we reiterate that Rule 54.02 of the Tennessee Rules of Civil Procedure requires the trial judge to include several items in its Rule 54.02 certification. "First, Tenn. R. Civ. P. 54.02 requires that the order certified as final actually adjudicate one or more of the parties' claims, meaning all claims by or against that party. Second, the trial court must determine that there is 'no just reason for delay.'" ***Brentwood Chase Cmty. Ass'n v. Truong***, No. M2014-01294-COA-R3-CV, 2014 WL 5502393, at *2 (Tenn. Ct. App. Oct. 30, 2014) (citations omitted).

In the posture as Appellee, Wife presents one issue for our review, as restated below:

> IV. Whether the trial court erred in its division of Ronald Franks
> Construction, LLC?[8]

## ANALYSIS

### *Standard of Review*

Although Husband appears to only appeal the trial court's ruling with regard to the award of alimony, Husband bases his argument on the trial court's alleged errors in valuing the parties' marital property. In his appellate brief, Husband makes six assignments of error, which challenge the factual findings made regarding not only Wife's ability to secure employment, Wife's future employment, and Husband's actual income, but also the value placed on the parties' motor home and the LLC. In addition, Wife argues that the trial court erred in its division of marital property with regard to the LLC. Thus, the issues in this case concern both the trial court's decisions with regard to alimony and property division, which appear to be interwoven. Accordingly, a brief recitation of the standard of review applicable to these issues is helpful.

With regard to alimony, the Tennessee Supreme Court has consistently recognized

---

[8]We note that Rule 7 of the Tennessee Rules of the Court of Appeals requires that, in all cases where a party takes issue with the classification and division of marital property, the party must include in its brief a chart displaying the property values proposed by both parties, the value assigned by the trial court, and the party to whom the trial court awarded the property. Rule 7 also requires that "[e]ach entry in the table must include a citation to the record where each party's evidence regarding the classification or valuation of the property or debt can be found . . ." In *Harden v. Harden*, No. M2009-01302-COA-R3-CV, 2010 WL 2612688 (Tenn. Ct. App. June 30, 2010), this Court opined:

> The Court has previously held where an appellant fails to comply with this rule, that appellant waives all such issues relating to the rule's requirements. This Court is under no duty to search a trial record in order to discern the valuation of the couple's property. This Court has previously found issues involving the valuation and division of property waived for failure to comply with Rule 7.

*Id.* at \*8 (citations omitted). Despite Wife's failure to comply with Rule 7, we soldier on relying on the record and proof presented at trial. Our decision to soldier on in spite of Wife's failure to include her Rule 7 chart should not be construed as an indication that waiver does not typically apply in this situation. We caution litigants that although we have reviewed the issue in this case, we may not be as forgiving in the future.

that trial courts in Tennessee have broad discretion to determine whether spousal support is needed and, if so, to determine the nature, amount, and duration of the award. *See, e.g.*, ***Gonsewski v. Gonsewski***, 350 S.W.3d 99, 105 (Tenn. 2011); ***Bratton v. Bratton***, 136 S.W.3d 595, 605 (Tenn. 2004); ***Burlew v. Burlew***, 40 S.W.3d 465, 470 (Tenn. 2001); ***Crabtree v. Crabtree***, 16 S.W.3d 356, 360 (Tenn. 2000). Because a trial court's "decision regarding spousal support is factually driven and involves the careful balancing of many factors," ***Gonsewski***, 350 S.W.3d at 105 (footnote omitted), the role of an appellate court is not to second guess the trial court or to substitute its judgment for that of the trial court, but to determine whether the trial court abused its discretion in awarding, or refusing to award, spousal support. ***Id.***; ***White v. Vanderbilt Univ.***, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999) ("If a discretionary decision is with within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative."). "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." ***Id.*** (citing ***Wright ex rel. Wright v. Wright***, 337 S.W.3d 166, 176 (Tenn. 2011); ***Henderson v. SAIA, Inc.***, 318 S.W.3d 328, 335 (Tenn. 2010)). In determining whether the trial court abused its discretion, an appellate court "should presume that the [trial court's] decision is correct and review the evidence in the light most favorable to the decision." ***Gonsewski***, 350 S.W.3d at 105–06; *see also* Tenn. R. App. P. 13(d) ("[R]eview of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding[s], unless the preponderance of the evidence is otherwise."). Additionally, in deciding whether to award spousal support and, if so, determining the nature, amount, length, and manner of payment, the trial court must balance the factors in Section 36-4-121(i). *See* Tenn. Code Ann. § 36-4-121(c) (listing several factors that the trial court "shall" consider when awarding spousal support). ***Holifield v. Holifield***, No. W2012-00806-COA-R3-CV, 2014 WL 527641, at *5 (Tenn. Ct. App. Feb. 10, 2014). "An alimony award depends on the circumstances of each case, with financial need of the recipient spouse and the obligor spouse's ability to pay being the primary considerations." ***Id.*** (citing ***Burlew***, 40 S.W.2d at 472).

On the other hand, in the context of the division of marital property, Tennessee law provides that the division of marital property, including its classification and valuation, are findings of fact. ***Woodward v. Woodward***, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007). Accordingly, the trial court's decisions regarding classification, valuation, and division of property are reviewed *de novo* with a presumption of correctness unless the evidence preponderates otherwise. ***Farrar v. Farrar***, 553 S.W.2d 741, 743 (Tenn. 1977). Trial courts have "wide latitude in fashioning an equitable division of marital property." ***Altman v. Altman***, 181 S.W.3d 676, 683 (Tenn. Ct. App. 2005); however, Tennessee Code Annotated Section 36-4-121(c) directs the trial court to consider a list of factors when making equitable

division of marital property. *See* Tenn. Code Ann. § 36-4-121(c) (listing several factors the trial court "shall consider" before equitably divided the parties' marital property). The division of marital property is rooted in equity, and a division of marital property is not rendered inequitable merely because it is not precisely equal, *Lofton v. Lofton*, 345 S.W.3d 913, 923 (Tenn. Ct. App. 2008) (citing *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996)), or because each party does not receive a share or portion of each marital asset. *Lofton*, 345 S.W.3d at 923 (citing *Cohen*, 937 S.W.2d at 833)).

Because the valuation issues regarding the division of the parties' marital property permeate all the issues raised by the parties, we address those issues first.

### *Value of the LLC*

We begin our analysis with the trial court's findings regarding the value of the LLC as a marital asset. The trial court, in its ruling, stated:

> But since I can't rely on any testimony as to what the business would be worth, I am going to award the business to [Husband] without making any division of equity in the business because I just don't think I can.

The only proof regarding the value of the LLC at trial was Husband and Ms. Willoughby's testimony that the LLC had an approximately $218,000 negative net worth. The court noted that Wife did not supply any proof regarding the value of the LLC.[9] Despite this evidence, the trial court specifically stated that it "[did] not believe that the business has a $218,069.16 negative net worth."

Regarding the finances of the LLC, the trial court stated:

> However, [the LLC] does have a considerable amount of reoccurring debt. It looks like in 2012 the gross receipts were $12,098 - - or I mean 12,098,558. There is at least an open credit line with approximately five - - or half a million dollars owed on it. However, from looking at the statements in 2010 there was $713,792 worth of depreciation which is deducted as money out

---

[9]The trial court stated that it could "discount" Wife's failure to provide a value of the LLC "because of the way that some of these items are valued just looking at a few of the things that were itemized for the personal property. The [motor home], they put a fair market value of $166,000, but the debt that's allegedly owed on that is $291,639. So that's - - that's a swing of over $130,000."

of a business that actually isn't a loss.

I mean that's not money that's actually paid that. And in 2011 it was a lesser amount, a considerably lesser amount. It was $300,576 that was shown there's a loss or a part of that loss that wasn't actually paid out. And then in 2012 - - in other words, it's a paper loss. And then in 2000 - - yeah, '12, let's see, there was $136,264. I noticed through the course of the testimony that there was never any indication that the business was floundering for lack of available cash capital to pay the bills, even though some of that was attributed to the - - credit line, it appears just from looking at the tax returns about from one year to the next about a million dollars cash on hand is available in order to conduct business.

\* \* \*

. . . if you looked at - - if you looked just the depreciation alone in 2010, that wasn't a 16 - - or a 1.6 million dollar loss. If you're looking at that, it's more like an $800,000 loss. And I thought what was interesting when I'm looking at their - - at their tax returns and their balancing statements is that the - - that the actual wages expended for all the employees, which includes [the LLC's other 50% owner] and [Husband], is about - - it's not even ten percent. And it's not even - - it's about give percent of the total gross income of the business.

\* \* \*

If you were to take the depreciation out of the equation on the other two years instead of - - even if it's accrual basis, the 2011 would it over a million, and the 2012 would get it right at a million dollars. Instead of awarding her a portion of the business, because I just don't see a good way to do that, like I said before, if I did a rough addition of the - - of the depreciation that was shown on paper, but it was not actually money lost, you'd be talking about $1,100,000 more or less over a period of three years.

If you divided that by two, between - - dividing it between [the

LLC's other 50% owner] and [Husband], that's about eleven hundred - - I mean, about $5 - - let me check my math here - - yeah, $550,000, and you divide that between the two parties, you're talking about $275,000. Clearly based on - - of course, if you divided that over the course of three years because that's what we're talking about, over $75,000 a year.

Ultimately, despite the trial court's attempts to factor in depreciation and wages to employees, the trial court never placed a value on the LLC.

Tennessee law is clear that "[t]rial courts must place a reasonable value on marital property that is subject to division." ***Kraus v. Thomas***, No. M2012-00877-COA-R3-CV, 2013 WL 2612458, at *10 (Tenn. Ct. App. June 7, 2013); ***Jacobsen v. Jacobsen***, No. M2012-01845-COA-R3-CV, 2013 WL 1400618, at *9 (Tenn. Ct. App. Apr. 5, 2013) (citing ***Edmisten v. Edmisten***, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003)). The parties bear the burden "to provide competent valuation evidence." ***Kraus***, 2013 WL 2612458, at *10 (citing ***Kinard v. Kinard***, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998). "If the parties' valuation evidence is conflicting, the trial court 'may place a value on the property that is within the range of the values presented.'" ***Barnes v. Barnes***, No. M2012-02085-COA-R3-CV, 2014 WL 1413931, at *5 (Tenn. Ct. App. Apr. 10, 2014) (citing ***Watters v. Watters***, 959 S.W.2d 585, 589 (Tenn. Ct. App. 1997)).

In non-jury cases such as this, Rule 52.01 of the Tennessee Rules of Civil Procedure provides that trial courts "**shall** find the facts specially and state separately its conclusions of law and direct the entry of the appropriate judgment." Tenn. R. Civ. P. 52.01 (emphasis added). Prior to July 1, 2009, trial courts were only required to make specific findings of fact and conclusions of law "upon request made by any party prior to the entry of judgment." *See* ***Poole v. Union Planters Bank N.A.***, No. W2009-01507-COA-R3-CV, 337 S.W.3d 771, 791 (Tenn. Ct. App. 2010) (noting the amendment). However, the current version of Rule 52.01 requires the court to make these findings regardless of a request by either party. ***Id.*** This Court has previously held that the requirement to make findings of fact and conclusions of law is "not a mere technicality." ***In re K.H.***, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009).

Instead, the requirement serves the important purpose of "facilitat[ing] appellate review and promot[ing] the just and speedy resolution of appeals." ***Id.***; ***White v. Moody***, 171 S.W.3d 187, 191 (Tenn. Ct. App. 2004); ***Bruce v. Bruce***, 801 S.W.2d 102, 104 (Tenn. Ct. App. 1990). The Tennessee Supreme Court recently explained that Rule 52.01 findings and conclusions serve three important purposes:

First, findings and conclusions facilitate appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision. *See Estate of Bucy v. McElroy*, No. W2012-02317-COA-R3-CV, 2013 WL 1798911, at *3–4 (Tenn. Ct. App. Apr. 26, 2013) (noting that the Rule 52.01 requirement facilitates appellate review); *Hardin v. Hardin*, No. W2012-00273-COA-R3-CV, 2012 WL 6727533, at *5 (Tenn. Ct. App. Dec. 27, 2012) (same); *In re K.H.*, No. W2008–01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009) (recognizing that without findings and conclusions appellate courts are left to wonder about the basis of a trial court's decision); *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *19 (Tenn. Ct. App. Apr. 21, 2004 (same); 9C [Charles A. Wright *et al.*,] *Federal Practice and Procedure* § 2571, at 219 [(3d ed. 2005)] [hereinafter 9C *Federal Practice and Procedure*] (recognizing that specific findings by the trial court facilitate appellate review). Second, findings and conclusions also serve "to make definite precisely what is being decided by the case in order to apply the doctrines of estoppel and res judicata in future cases and promote confidence in the trial judge's decision-making." 9C *Federal Practice and Procedure* § 2571, at 221–22. A third function served by the requirement is "to evoke care on the part of the trial judge in ascertaining and applying the facts." *Id.* at 222. Indeed, by clearly expressing the reasons for its decision, the trial court may well decrease the likelihood of an appeal. *Hardin*, 2012 WL 6727533, at *5.

*Lovelace v. Copley*, 418 S.W.3d 1, 34–35 (Tenn. 2013). "Without such findings and conclusions, this court is left to wonder on what basis the court reached its ultimate decision." *In re K.H.*, 2009 WL 1362314, at *8 (quoting *In re M.E.W.* No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *19 (Tenn. Ct. App. Apr. 21, 2004)).

We ordinarily defer to the trial court's decision regarding the division of marital property unless it is inconsistent with the factors in Section 36-4-121(c) or is not supported by a preponderance of the evidence. *Mahaffey*, 775 S.W.2d at 622; *Hardin*, 689 S.W.2d at 154. Although the trial court did consider some of the factors, he rejected the only evidence regarding the net worth of the LLC without ruling on what the value of the LLC would be for purposes of the equitable division of marital property or alimony. Of course, the trial court, as the finder-of-fact, is "the final arbiter of witness credibility, [and is] free to reject

-14-

any or all of the testimony presented by the . . . witnesses." ***State v. Morrell***, No. E2013-02431-CCA-R3-CD, 2014 WL 4980400, at \*7 (Tenn. Crim. App. Oct. 7, 2014) (citing ***State v. Dorantes***, 331 S.W.3d 370, 379 (Tenn. 2011)).

However, neither confusing financial records nor the trial court's discretionary decision to reject certain testimony excuse the trial court from making the required findings in this case. Generally, the appropriate remedy when a trial court fails to make appropriate findings of fact and conclusions of law is to "vacate the trial court's judgment and remand the cause to the trial court for written findings of fact and conclusions of law." ***Lake v. Haynes***, No. W2010-00294-COA-R3-CV, 2011 WL 2361563, at \*1 (Tenn. Ct. App. June 9, 2011). However, this Court has previously held that:

> [W]hen faced with a trial court's failure to make specific findings, the appellate courts may "soldier on" when the case involves only a clear legal issue, ***Burse v. Hicks***, No. W2007-02848-COA-R3-CV, 2008 WL 4414718, at \*2 (Tenn. Ct. App. Sept. 30, 2008), or when the trial court's decision is "readily ascertainable." ***Burgess v. Kone, Inc.***, No. M2007-02529-COA-R3-CV, 2008 WL 2796409, at \*2 (Tenn. Ct. App. July 18, 2008).

***Rogin v. Rogin***, No. W2012-01983-COA-R3-CV, 2012 WL 3486955, at \*8 (Tenn. Ct. App. July 10, 2013). In this case, the issues concerning the amount of Husband's alimony obligation and the amount of property awarded to each party involve neither a clear legal issue, nor is the basis for the trial court's calculation "readily ascertainable." ***Id.***

While we understand Husband's argument that the evidence demonstrating the negative net worth of the LLC was unrefuted, it is not the charge of this Court to accept the value Husband places on the LLC when the trial court explicitly rejected that fact in its ruling. The trial court stated that it did not believe that the business was struggling financially in the way Husband testified it was. The trial court found that "it appears to the Court from reviewing the exhibits, and listening to the proof, there has been some commingling between the business, [the LLC], and the individual assets of the parties." We typically defer to the trial court's judgment on findings of credibility because "the trial court is specially qualified to evaluate the credibility of witnesses by virtue of its ability to observe the demeanor of witnesses as they testify." ***Davis v. Davis***, 223 S.W.3d 233, 238 (Tenn. Ct. App. 2006). As such, the trial court is accorded great deference in resolving factual disputes when a witness's credibility presents a significant concern. ***Id.***

In addition, we note that even Husband's brief offers two different values for the net

worth of the LLC. In his Statement of the Facts, he provides that "the documentary evidence shows a 2013 net worth for the LLC of negative [$436,138.33]." However, in his Argument, he states that the trial court "rejected the unchallenged, stipulated[10] fact that the LLC has a negative net worth of $218,069.16." "[T]his Court is under no duty to search a trial record in order to discern the valuation of the couple's property." ***Harden v. Harden***, No. M2009-01302-COA-R3-CV, 2010 WL 2612688, at *8 (Tenn. Ct. App. June 30, 2010). More importantly, we decline to do so when the parties fail to include the proper charts,[11] yet direct us to review over nearly 850 pages of financial documents.

Simply stated, the trial court's ruling did not include the value of the LLC—one of the largest marital assets owned by the parties and capable of producing income into the future. Accordingly, we vacate the trial court's ruling on the division of marital property and the trial court's ruling with regard to alimony. We remand to the trial court for entry of an order specifying the basis for the trial court's determination of the LLC's value. We decline to address the remaining issues presented by Husband at this time because their determinations will be affected by the decision of the value of the LLC, as discussed below.

### *Value of the Motor Home*

With regard to the value of the parties' motor home, the trial court ruled:

> The 2008 Monaco Dynasty Yorkshire [motor home], they put a fair market value of $166,000, but the debt that's allegedly owed on that is $291,639. So that's - - that's a swing of over $130,000.
> I don't find that to be a fair representation of the value of that Dynasty Yorkshire, and I saw a picture of it in there. I think that

---

[10]Although Husband contends that the negative net worth of the LLC was stipulated to, it appears to this Court that only the admissibility and entry of the financial documents was stipulated to, not the numerical value of the LLC itself. Before the hearing, the trial judge asked Husband's counsel:

> THE COURT: And both parties are stipulating to the admissions of [the two binders containing the parties' financial information]?
>
> HUSBAND'S COUNSEL: Yes, Your Honor.

The record is devoid of any mention that the parties' stipulated to the value of the LLC.

[11]*See supra* p. 15 note 8 (explaining the requirement that parties raising issue with property division must provide the required chart as mandated by Rule 7 of the Tennessee Rules of the Court of Appeals).

that is undervalued . . . .

Both parties included a proposed value of the motor home within their chart provided to the trial court. Husband valued the motor home at $166,000.00, which the trial court, as stated above, rejected. Wife valued the motor home at $175,000.00, which the trial court did not explicitly accept or reject.

In this case, the trial court again did not state what the value of the motor home was before it awarded it to Husband, in contravention of both case law and Rule 52.01. *See Kraus*, 2013 WL 2612458, at *10. Further, as in this case, when the parties' valuations conflict, the trial court "may place a value on the property that is within the range of the values presented." *Barnes*, 2014 WL 1413931, at *5. Although we can infer from the trial court's ruling that the value would be greater than Husband's proposed value of $166,000.00, it is unclear whether the court accepted Wife's value of $175,000.00 or an amount within the parties' range of values. Accordingly, the trial court's determination as to the value of the motor home is vacated and remanded for specific findings of facts.[12]

### *Issues Remaining*

As the trial court's findings of facts are insufficient as to the value of the LLC and the motor home, two of the parties' largest marital assets, this Court is unable to review the trial court's determinations regarding several other issues presented by the parties. Specifically, we are unable to review:

- Husband's argument that trial court erred in its factual findings regarding his future employment, as that will be affected by the value and financial status of the LLC as determined on remand;
- Husband's argument that the trial court erred regarding the available cash of the LLC, as that is affected by the value of the LLC;
- Husband's argument that the trial court erred in finding that he had $16,000.00 in monthly income, as that will be affected by the value and financial status of the LLC as determined on remand;

---

[12]Husband raises this issue regarding the value of the motor house in the context of alimony. He argues that the trial judge erred when he ruled that the motor home was "under valued." Wife does not raise this as an issue. Although Husband's issue is better framed as an issue concerning the division of marital property, we still remand this issue for reconsideration as the issues of alimony and division of marital property often overlap. *See* Tennessee Code Annotated Section 36-5-121(i) ("In determining whether granting an order for payment of support and maintenance to a party is appropriate, the court shall consider all relevant factors, including: . . . [t]he provisions made with regard to marital property, as defined in § 36-4-121.").

- Husband's argument that Wife was entitled to attorney's fees, as a form of alimony
- Wife's issue regarding whether the trial court properly divided the LLC in the division of property as we are unable to determine whether the distribution made by the trial court was equitable without knowing the value of the largest asset awarded to Husband, the LLC.

In sum, the trial court's failure to properly value the marital assets prevents this Court from reviewing the various issues raised by the parties. Accordingly, we vacate and remand to the trial court with instructions to: 1) assign a specific value to both the LLC and the motor home; and 2) reconsider its decisions with regard to alimony and property division in light of the value assigned to that property. The trial court may, in its discretion, consider additional evidence regarding the proposed value of the LLC if it deems it necessary.

### *Wife's Need for Alimony* In Futuro

Husband also raises an issue as to the trial court's finding that Wife has a need for alimony. Because we are remanding to the trial court to make appropriate findings and reconsider its decisions in light of those findings, we decline to address the remaining issues raised by Husband, including Wife's inability to secure employment and her need for alimony. While we note that the trial court made factual findings as to both of these issues, reconsideration of these issues, may be needed upon the remand and review of the value of the LLC and motor home. As such, these issues are pretermitted.

### CONCLUSION

The judgment of the Hardin County General Sessions Court is vacated and this case is remanded for further proceedings consistent with this Opinion. Costs of this appeal are taxed one-half to Appellant Ronald Franks, and his surety, and one-half to Appellee Cathy Turnbo Franks, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE

-18-